**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 13-cv-03499-REB

WILLARD C. SMITH,

      Applicant,

v.

BOBBY BONNER, Warden, and
CYNTHIA COFFMAN,[1] Attorney General, State of Colorado,

      Respondents.

---

**ORDER ON APPLICATION FOR A WRIT OF HABEAS CORPUS**

---

**Blackburn, J.**

This matter is before me on the [Amended] **Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254** ("Amended Application") [#10][2] filed February 12, 2014, by Applicant, Willard C. Smith.  Respondents answered the Amended Application [#28], and Applicant filed a traverse [#29].  After reviewing the pertinent portions of the record in this case including the Amended Application, the Answer, the Traverse, and the state court record, I conclude that the Application should be denied.

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), the current Attorney General for the State of Colorado, Cynthia Coffman, has been substituted for John Suthers, the former Attorney General.

[2]  "[#10]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

## I.  BACKGROUND

In 2005, Applicant was convicted by a jury of second degree murder in Otero County District Court Case No. 04CR247.[3] [# 18-1, at 3].  During trial, Applicant pled guilty to Count 4 of the Information, charging him with possession of a weapon by a previous offender ("POWPO" charge).  [*Id.* at 3-4].  He was sentenced to an aggregate prison term of 48 years with the Colorado Department of Corrections. [*Id.* at 3].

The Colorado Court of Appeals summarized the relevant facts on direct review of Applicant's convictions, in *People v. Willard Clayton Smith* (*Smith I*), No. 06CA0935 (Colo. App. April 17, 2008):

> In October 2004, defendant was living in a bus parked next to a house occupied by T.H. and her boyfriend, the victim.
>
> On October 7, 2004, defendant went to a local bar where he drank with T.H. and the victim. Defendant insulted T.H., and defendant and the victim argued. During the argument, defendant threatened to kill the victim. Defendant and the victim resolved the argument and eventually became intoxicated. Later, defendant, T.H., and the victim left the bar together, stopped at a liquor store to purchase beer and whiskey, and returned home.
>
> T.H. testified that defendant and the victim were very intoxicated, loud, and obnoxious and she told them to leave the house. Defendant and the victim resumed their drinking spree in defendant's bus. Later, T.H. observed defendant and the victim having a "heated conversation."
>
> Later, during dinner, T.H. asked the victim to leave the house and with the aid of her son, locked the victim out of the house. Angry, the victim threw a cooler at the front door, got into his truck, and drove in circles in the yard. The next morning, the victim was gone.
>
> T.H.'s children each testified that they heard a gunshot after they went to bed, but did not tell anyone until a few days later.

---

[3]State Court R., Court File, Jury Verdicts, at 214-219.

Over the next few days, defendant told inconsistent stories about the victim's disappearance, stating that the victim had "run off" with another woman, that he had loaned the victim $50 and he had walked away through a field, that the victim had met with a man about a methamphetamine deal, and that he had shot the victim and "fed him to the pigs."

On October 9, 2004, T.H. filed a missing person's report. The next day, T.H.'s son found the victim's body in a ditch near a hog pen and telephoned the police. The victim had been shot in the head and dragged into the ditch. The police officers found the victim's blood in and on the steps leading to defendant's bus and the gun used to shoot the victim under the bus.

Defendant was arrested on October 11, 2004. At the time of his arrest, defendant had two small cuts on his torso. Defendant told the police officer that "he got them from working on a car."

On October 13, 2004, defendant gave oral and written statements to the police. Defendant stated that on October 7, 2004, he had gone to bed, was awakened by the sound of the victim's truck, and got out his gun. After looking out his window and seeing that it was the victim, defendant sat down and laid his gun on the table. The victim then came into his bus, sat down at the table, asked to borrow $50, and offered his truck as collateral for the loan. When defendant refused to loan him money, the victim took a knife out of his back pocket and swung at him. Defendant stated that he picked up the gun and shot the victim in self-defense. Defendant stated he dragged the victim's body into the ditch, put the victim's knife back into its sheath, and placed the knife in the victim's truck.

[# 18-2 at 2-5].

The Colorado Court of Appeals affirmed Applicant's convictions and sentence on direct appeal. [*Id.*]. The Colorado Supreme Court denied Applicant's petition for certiorari review on August 18, 2008. [# 18-9].

Applicant thereafter filed a motion for state post-conviction relief, pursuant to Colo. Crim. P. Rule 35(c). [# 18-1, at 13]. The Colorado Court of Appeals affirmed the trial court's order denying the motion in *People v. William Clayton Smith* (*Smith II*), No.

3

11CA1034 (Colo. App. March 21, 2013) [#18-3].  The Colorado Supreme Court denied

Applicant's request for certiorari review on December 9, 2013. [#18-14].

Mr. Smith initiated this action on December 27, 2013.  He asserts the following

claims in his Amended Application:

- Trial counsel was ineffective in handling the POWPO charge (claims one and two) [#10, at 10-12];

- Trial counsel was ineffective in failing to present a defense under Colorado's ""make my day" statute (claim three) [*Id.* at 14];

- Trial counsel was ineffective in: (a) requesting a competency evaluation for Applicant; and, (b) thereafter failing to adequately advise Applicant concerning the necessity and implications of waiving his right to a speedy trial (claim four) [*Id.* at 15];

- The trial court violated Applicant's constitutional rights by failing to grant Applicant's request for substitution counsel (claim five) [*Id.* at 16];

- Applicant's constitutional rights were violated when the police failed to collect and preserve a knife found at the crime scene (claim six) [*Id.* at 17]; and,

- The trial court violated Applicant's constitutional rights by denying newly-appointed sentencing counsel's request for a continuance of the sentencing hearing to allow him to obtain the trial transcripts (claim seven) [*Id.* at 18].

Respondents concede that the Application is timely pursuant to the AEDPA one-

year limitation period, 28 U.S.C. § 2244(d)(1). [# 18, at 4-7].  Respondents further

concede that Applicant exhausted state remedies for all of his claims, except for claim

four.  [*Id.* at 9-12].  In a May 1, 2014 Order, Senior Judge Lewis T. Babbock rejected

Respondents' assertion of the failure to exhaust defense as to claim four. [# 21, at 3-4].

In a separate Order, Judge Babbock directed Respondents to file an Answer to the

Amended Application. [# 19].

4

I address below the merits of Applicant's claims under the deferential AEDPA standard of review.

## II.  LEGAL STANDARDS

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The applicant bears the burden of proof under § 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

A claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim.  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784-85 (2011).  In particular, "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning."  *Id.* at 784.  Thus, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 784-85.  Even "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Id.*

at 784.  In other words, the Court "owe[s] deference to the state court's *result*, even if its

reasoning is not expressly stated."  *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir.

1999).  Therefore, the court "must uphold the state court's summary decision unless

[the court's] independent review of the record and pertinent federal law persuades [the

court] that its result contravenes or unreasonably applies clearly established federal law,

or is based on an unreasonable determination of the facts in light of the evidence

presented."  *Id.* at 1178.  "[T]his 'independent review' should be distinguished from a full

de novo review of the petitioner's claims."  *Id*.

The *Richter* presumption is also applicable when a state-court opinion addresses

some but not all of those claims.  *Johnson v. Williams*, 133 S. Ct. 1088, 1094-98 (2013).

For purposes of § 2254(d), when a state court rules against a defendant in an opinion

that rejects some of the defendant's claims but does not expressly address a federal

claim, a federal habeas court must presume, subject to rebuttal, that the federal claim

was adjudicated on the merits.  *Id.* at 1094-96.  Federal habeas courts should not

assume that any unaddressed federal claim simply was overlooked because a state

court does not uniformly discuss separately every claim referenced by a defendant.  *Id.*

The court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1).  *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003).  The threshold question the court must answer under § 2254(d)(1) is whether the

applicant seeks to apply a rule of law that was clearly established by the Supreme Court

at the time his conviction became final.  *See Williams v. Taylor*, 529 U.S. 362, 390

(2000).  Clearly established federal law "refers to the holdings, as opposed to the dicta,

of [the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Id.* at 412.  Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).  If there is no clearly established federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1).  *See id.* at 1018.

If a clearly established rule of federal law is implicated, the court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Williams*, 529 U.S. at 405 (citation omitted).

> A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407-08.  Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The court's inquiry pursuant to the "unreasonable application" clause is an objective inquiry.  *See Williams*, 529 U.S. at 409–10.  "[A] federal habeas court may not

7

issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id.* at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671.  In addition,

> evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Richter*, 131 S.Ct. at 786 (internal quotation marks omitted).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 131 S.Ct. at 786 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S.Ct. 786-87. *See also White v. Woodall*, 134 S. Ct. 1697 (2014) (citing and quoting *Richter*).

The court reviews claims asserting factual errors pursuant to 28 U.S.C.

§ 2254(d)(2).  *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002).

Section 2254(d)(2) allows the federal court to grant a writ of habeas corpus only if the

relevant state court decision was based on an unreasonable determination of the facts

in light of the evidence presented to the state court.  Pursuant to § 2254(e)(1), the court

must presume that the state court's factual determinations are correct and the petitioner

bears the burden of rebutting the presumption by clear and convincing evidence.  "The

standard is demanding but not insatiable . . . [because] '[d]eference does not by

definition preclude relief.'"  *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting

*Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

### III.  MERITS OF THE CLAIMS

### A.  Claims One through Three

In claims one through three, Applicant contends that his trial counsel was

ineffective in violation of his Sixth Amendment rights.

To prevail on an ineffective-assistance-of-counsel (IAC) claim, Applicant must

show that: (1) counsel's legal representation fell below an objective standard of

reasonableness; and (2) "the deficient performance prejudiced the defense." *Strickland*

*v. Washington*, 466 U.S. 668, 687-88 (1984).  Judicial scrutiny of counsel's performance

is highly deferential.  *Id.* at 689.  Counsel's decisions are presumed to represent "sound

trial strategy;" "[f]or counsel's performance to be constitutionally ineffective, it must have

been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914

(10th Cir. 1999) (internal quotations omitted).  Under the AEDPA standard of review,

"the question is not whether counsel's actions were reasonable.  The question is

whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S.Ct. at 788.

Prejudice exists when there is a reasonable probability that, but for counsel's defective representation, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 693.  The likelihood of a different result must be substantial, not just conceivable.  *Id.*  I need not address both prongs of the *Strickland* inquiry if Applicant's claim fails on one.  *Id.*  at 697.

### 1.  Claims one and two

Applicant asserts in claim one that his trial counsel was ineffective in the manner in which he handled the POWPO charge.  [# 10, at 10-12].  Applicant had previously been convicted, and sentenced to probation, for the crime of "aggravated driving with a revoked license."[4]

Specifically, Applicant asserts that trial counsel should have:

- objected to a probation officer's testimony that Applicant was previously on probation in a different criminal case and had violated the terms of his probation;

- requested bifurcation of the POWPO charge;

- objected to the prosecutor's opening statement to the jury that Applicant was a prior convicted felon.

[*Id.* at 10].

Applicant contends in claim two that trial counsel was ineffective when he advised the trial court that Applicant would plead guilty to the POWPO charge during his trial for second degree murder.  [*Id.* at 12].  Applicant maintains that he was prejudiced

---

[4]State Court R., 11/29/05 Trial Tr., at 30.

at trial by counsel's deficient performance because the jury's verdict finding him guilty of second degree murder was influenced by the knowledge that Applicant had a prior felony conviction and had violated the terms of his probation. [*Id.* at 11, 13].

### a. procedural history in the state courts

The trial court held an evidentiary hearing on Applicant's state post-conviction motion ("Rule 35(c) hearing"). Applicant testified that he did not know why counsel recommended that he plead guilty to the POWPO charge in the middle of his second degree murder trial, and that he did not understand the trial court's plea advisement.[5] Trial counsel testified at the hearing that he recommended Applicant plead guilty because Applicant had admitted in his written and verbal statements to police that he possessed the weapon that killed the victim and there was "no question" that Applicant was guilty of the POWPO charge.[6] In counsel's judgment, because the evidence supporting the charge was overwhelming, it was important to be forthright with both the court and the jury.[7]

The state district court denied Applicant's request for post-conviction relief on the ground that Applicant made the decision to plead guilty after an extensive plea hearing.[8]

In *Smith II*, the state appellate court affirmed the district court's ruling on the following grounds:

> We conclude that counsel's representation on this matter was sufficient. As the trial court noted, ultimately, defendant is responsible for pleading

---

[5] State Court R., 12/9/10 Hrg. Tr., at 111-112 .

[6] *Id.* at 163.

[7] *Id.* at 163-164.

[8] State Court R., Court File, at 373.

guilty. [*People v.*] *Bergerud*, 223 P.3d [686,], 693-94 [(Colo. 2010)] ("The decision] . . . whether to plead guilty . . . cannot be made by defense counsel, but rather must be made by the defendant himself."). Considering the evidence presented at trial against defendant, specifically defendant's own statements that he possessed the gun, we are unable to conclude that the strategy of defendant's conceding the [weapons possession] charge in order to gain credibility with the jury and court was necessarily flawed. *Cf. People v. Rodriguez*, 914 P.2d 230, 298 (Colo. 1996) (counsel was not ineffective for conceding the defendant's participation in events leading to the death of the victim in order to avoid losing credibility with the jury); *Davis* [*v. People*], 871 P.2d [769,] 777 [(Colo. 1994)] (counsel was not ineffective for acknowledging the strength of the prosecution's case and instead focusing on reducing the defendant's sentence "[r]ather than attempting to 'argue the absurd'"). And while the timing of the guilty plea might be criticized, "[t]he constitutional right to effective assistance of counsel 'is not a guarantee against mistakes of strategy or exercise of judgment in the course of a trial as viewed through the 20-20 vision of hindsight following the return of a verdict in a criminal case.'" [*People v.*] *Gandiaga*, 70 P.3d [523,] 525 [(Colo. App. 2002)] (quoting *Dolan v. People*, 168 Colo. 19, 22-23, 449 P.2d 828, 830 (1969)).

[# 18-3, at 11-12].

### b. Application of AEDPA standard of review

I and find and conclude that the Colorado Court of Appeals' resolution of Applicant's first and second claims challenging trial counsel's decisions concerning the POWPO charge was consistent with *Strickland.* The state appellate court's finding that counsel's decisions constituted reasonable trial strategy was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S.Ct. at 786-87.

Furthermore, even if defense counsel had moved to sever the POWPO charge from the second degree murder trial, the jury would have learned about Applicant's prior felony conviction. Applicant's statements to the police that he possessed a gun and

used it to shoot the victim were admitted at trial through the testimony of the

Undersheriff.  On cross examination, the defense further questioned the Undersheriff

about Applicant's hearsay statements in order to establish self-defense.[9]  Under those

circumstances, evidence of Applicant's prior felony conviction was admissible.  In

*People v. Kruger*, 296 P.3d 294, 308 (Colo. App. 2012), the state appellate court

concluded:

> W[h]ere a defendant does not testify at trial, but he or she elicits his or her
> own hearsay statements through another witness, CRE 806 authorizes the
> jury to hear impeachment evidence that would have been admissible if the
> defendant had testified because, in such circumstances, the defendant is
> in essence functioning as a witness on his or her own behalf.")

(internal citation and quotation marks omitted).  *See also* COLO. REV. STAT. ("C.R.S.")

§ 13-90-101 (2014) ("[T]he conviction of any person for any felony may be shown for the

purpose of affecting the credibility of such witness.").

And, finally, even if the prior felony would not have been admissible for

impeachment purposes, Applicant has not established any prejudice from counsel's

failure to request bifurcation of the POWPO charge.  It was undisputed that Applicant

shot the victim with a firearm he kept in his bus.  The only issue at trial was whether the

shooting was legally justified.  Applicant relied on his voluntary statement to the

Undersheriff to establish self defense.  However, the Undersheriff's testimony undercut

that theory[10] and the jury was not persuaded.  In his § 2254 Application, Applicant

merely speculates that he was prejudiced by evidence of: his prior felony conviction for

aggravated driving with a revoked license; and, his violation of probation by possessing

---

[9] State Court R., 11/29//05 Trial Tr., at 235-249; 11/30/05 Trial Tr., at 32-39.

[10] *See id.*, 11/29/05 Trial Tr., at 215-17, 235-49; 11/30/05 Trial Tr., at 32-61; 81-100. *See also* 11/28/05 Trial Tr., at 234-37.

a firearm and testing positive for the use of marijuana and alcohol.[11]  However, this

information was not inherently prejudicial in a second degree murder case and "it is

well-established that . . . speculation alone cannot give rise to a 'reasonable probability'

that the outcome of the trial would have been different."  *Byrd v. Workman*, 645 F.3d

1159, 1173 (10th Cir. 2011); *see also United States v. Boone*, 62 F.3d 323, 327 (10th

Cir. 1995) ("[A]ll that the Defendant urges is speculation, . . . [and] [a]ccordingly, he

cannot establish prejudice.").

Accordingly, claims 1 and 2 lack merit and will be dismissed.

### 2. Claim three

For his third claim, Applicant contends that trial counsel was ineffective in failing

to present a defense under Colorado's "make my day" statute because the victim's entry

onto Applicant's bus immediately prior to the shooting was unlawful.  [# 10, at 14].

The statute states, in pertinent part:

> [A]ny occupant of a dwelling is justified in using any degree of
> physical force, including deadly physical force, against another person
> when that other person has made an unlawful entry into the dwelling, and
> when the occupant has a reasonable belief that such other person has
> committed a crime in the dwelling in addition to the uninvited entry, or is
> committing or intends to commit a crime against a person or property in
> addition to the uninvited entry, and when the occupant reasonably
> believes that such other person might use any physical force, no matter
> how slight, against any occupant.

§ 18-1-704.5(2), C.R.S. (2014).

"[A]n unlawful entry means a knowing, criminal entry into a dwelling." *People v.*

*McNeese*, 892 P.2d 304, 31 (Colo.1995). *See also id.* at 310 ("The legislative history

indicates that the General Assembly intended the "make-my-day" statute to apply in

---

[11] *Id.*, 11/29/05 Trial Tr., at 29-45.

situations where an intruder illegally enters a dwelling. The hearings and debates also demonstrate that the bill was meant to deter criminals from breaking into a home to commit a crime.").

### a. state court proceedings

At trial, several witnesses testified that Applicant and the victim had been drinking in Applicant's bus together earlier on the day the victim was shot.[12]  There was no evidence at trial describing the victim's entry to the bus immediately prior to the shooting.

At the Rule 35(c) hearing, Applicant testified that the victim "barged" onto his bus uninvited, was "out of control," and that once on the bus, the victim pulled a knife out of the back of his pants, at which point he and the Applicant engaged in a wrestling match before Applicant shot him.[13]

Applicant's trial counsel testified at the Rule 35(c) hearing that he did not believe the "make my day" statute applied to Applicant's case because Applicant did not indicate to him or the defense investigator before trial that the victim's entry onto his bus was uninvited.[14]  Instead, Applicant told him that he and the victim had been in the bus together drinking earlier that day.[15]  Counsel further testified that nothing in the discovery suggested that the victim entered the Applicant's bus unlawfully.[16]

---

[12]State Court R., 11/28/05 Trial Tr., at 44, 72, 83, 106; 11/29/05 Trial Tr., at 58, 157.

[13]*Id.*,12/9/10 Hrg. Tr., at 105-07, 139.

[14]*Id.* at 158-59, 212.

[15]*Id.*

[16]*Id.* at 159, 204.

The state post-conviction court denied Applicant's Rule 35(c) motion, concluding, in relevant part, that the "make my day" defense was inapplicable given that there was no evidence at trial that the victim entered Applicant's bus unlawfully.[17]

In *Smith II*, the Colorado Court of Appeals addressed Applicant's IAC claim as follows:

> We conclude that defendant failed to establish that counsel's performance on this issue was deficient, considering the conflicting testimony about the victim's permission to enter defendant's bus. This is a matter of trial strategy left to the discretion of counsel and his decision not to argue the make my day statute, based in part on defendant's own account of the events that night and evidence that tended to show that the victim was a frequent invitee, was not outside the wide range of professionally competent assistance on this issue. *See Strickland*, 466 U.S. at 689; *People v. Bergerud*, 223 P.3d 686, 693 (Colo. 2010) ("[T]he right to an attorney is not a right to a mouthpiece or marionette, but rather to competent counsel who will employ her own professional expertise in effectively representing her client's interests."); *see also People v. Isham*, 923 P.2d 190, 196 (Colo. App. 1995) (the defendant's own statements or actions may influence counsel's decision to continue or discontinue investigation).

[# 18-3, at 6-7].


### b.  application of AEDPA standard of review

There was no evidence at trial to support a reasonable inference that the victim entered the Applicant's dwelling unlawfully at the time the victim was shot.  Further, although Applicant testified at the Rule 35(c) hearing that the victim's entry onto his bus was uninvited, he did not state that he gave this information to defense counsel or the defense investigator prior to trial.  As such, counsel's strategic decision not to assert a

---

[17] *Id.*, Court File, at 373.

"make my day" defense was one of reasonable trial strategy.  *See Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005) ("Whether to raise a particular defense is one aspect of trial strategy, and informed strategic or tactical decisions on the part of counsel are presumed correct, unless they were completely unreasonable, not merely wrong.") (internal quotation marks and citation omitted).  *Cf. Rodriguez*, 914 P.2d at 295 (defense counsel's failure to investigate or present mitigating evidence does not constitute ineffective assistance when the essential and foundations information required to trigger such an investigation is withheld from the defendant's counsel by the defendant himself).

Moreover, Applicant was not prejudiced by counsel's failure to raise a "make my day" defense because, under Colorado law, a "defendant is entitled to a jury instruction stating an affirmative defense [only] if there is evidence presented to support such a defense. . ." *People v. Mossmann*, 17 P.3d 165, 169 (Colo. App. 2000) (citing *People v. Fuller*, 781 P.2d 647, 651 (Colo. 1989)); *accord Spears v. Mullin,* 343 F.3d 1215, 1251 (10th Cir. 2003) (rejecting habeas petitioner's claim that trial counsel was ineffective in failing to request jury instructions on certain defenses where the evidence did not support giving the instructions under state law).

I find and conclude that the state appellate court's resolution of Applicant's claim comported with *Strickland*.  Claim three lacks merit and will be dismissed.

## B.  Claims Four and Five

In claim four, Applicant contends that trial counsel was ineffective in (a) requesting a competency evaluation for Applicant; and, (b) thereafter failing to explain to Applicant the consequences of not waiving his right to speedy trial. [# 10, at 15].

For his fifth claim, Applicant contends that the trial court violated his constitutional rights by failing to grant a request for substitution counsel.
[# 10, at 16].

I address claims four and five together because they arise from the same pre-trial motions and proceedings.

### a.  state district court proceedings

Less than two months before trial, defense counsel filed a motion to withdraw based on an "irreconcilable conflict" between counsel and Applicant that "prevent[ed] the necessary cooperation and communication . . . that must exist in order for [defendant] to assist his attorney in the defense of these serious charges."[18] Defense counsel maintained that Applicant was dissatisfied with his representation, believed that counsel "sold him down the river," and did not trust counsel's opinion.[19]  Counsel also filed a motion to determine the Applicant's competency to proceed to trial.[20]

On September 14, 2005, the trial court held a hearing on defense counsel's motion.  In *Smith I*, the Colorado Court of Appeals made the following factual findings in conjunction with that hearing:

> [At the hearing], the court questioned defendant about his communication with his counsel. Defendant stated that he could communicate with him and that he understood what he said, but his counsel was not explaining what he wanted to know. When the court asked defendant if the problem resulted from a "difference of opinion" about "how the case should go," defendant responded that he had questions about his case and had a "hard time" trusting his counsel because he "grits his teeth, raises his voice, and hollers at me." Defendant

---

[18]State Court R., Court File, at 67.

[19]*Id.*

[20]*Id.* at 65.

then indicated that he could get along with counsel if he did not raise his voice, but was concerned it would happen again.

Defendant's counsel stated that defendant did not believe the advice he gave him and was raising issues that did not have anything to do with his case.

The court denied counsel's motion to withdraw, concluding that "it sounds like the issues are surrounding strategy in the case and not so much surrounding some kind of a personality conflict or communication breakdown that's total in nature." The court instructed defendant to file a motion if at some point his relationship with his counsel was "not at all viable."

[#18-2, at 6-7].[21]  The trial court then stayed the proceedings and granted counsel's request that Applicant undergo a competency evaluation.[22]

On September 20, 2005, Applicant filed, *pro se*, a "Motion for Removal of Appointed Counsel," in which he asserted that he did not trust his counsel's judgment; that his counsel had only met with him once; and that his counsel "snarl[s], shows his teeth, acts mean, raises his voice, hollers and tells defendant shut up, be quiet, and trust him."[23]

Another motions hearing was held on November 10, 2005, approximately two weeks before trial.  Upon reviewing the competency evaluation, the trial court concluded that Applicant was competent to proceed to trial.[24]  The court then addressed Applicant's motion requesting substitute counsel.[25] Defense counsel pointed out the

---

[21] *See also* State Court R., 9/14/05 Hrg. Tr.

[22] *Id.*

[23] *Id.*, Court File, at 74.

[24] *Id.,* 11/10/05 Hrg. Tr., at 2-3 .

[25] *Id.* at 3.

competency evaluator's additional finding in the report that Applicant was not capable of cooperating with defense counsel.[26]  Defense counsel further informed the court that Applicant wanted to make legal decisions that were within counsel's province and disagreed with decisions that counsel had made.[27] The court stated, "[W]hen I hear the different problems between you and [defendant], I keep hearing strategy, a difference of opinion on strategy."[28] The trial court asked Applicant if he wished to proceed *pro se*.[29] Applicant advised the court that he did not want to represent himself at trial and he refused to waive his speedy trial deadline, which was 15 days hence.[30]  The Court told Applicant that without waiving the state statutory speedy trial deadline, he could not be appointed new counsel, who would require additional time to prepare for trial.[31] Applicant agreed to proceed to trial with his current defense counsel.[32]  Counsel then requested a short recess to discuss the issue with Applicant.[33]  After conferring with counsel, Applicant remained steadfast in his decision to proceed to trial with current counsel before the speedy trial date elapsed.[34]

---

[26] *Id.* at 4.

[27] *Id.*, at 4-5.

[28] *Id.* at 5.

[29] *Id.* at 8.

[30] *Id.* at 7-9.

[31] *Id.*

[32] *Id.* at 9 .

[33] *Id.* at 12.

[34] *Id.* at 13.

At the Rule 35(c) hearing, both Applicant and trial counsel testified that, prior to

trial, counsel met with Applicant at the Bent County Jail to discuss his case.  Their

recollections of that meeting did not coincide.  Application testified that counsel met him

in the law library, and started hollering at him, which upset Applicant to the point that he

terminated the interview.[35]  By contrast, trial counsel testified that when he met the

Applicant at the jail, Applicant was obstinate, denied any responsibility for the victim's

death, and refused to discuss his use of alcohol and drugs to the extent that "he was

just denying . . . reality."[36]  Based on that interaction, counsel determined that Applicant

was unable to assist with his defense and asked the trial court to have Applicant

evaluated.[37]

Trial counsel also testified at the Rule 35(c) hearing that in addition to the

meeting at the jail, he met with Applicant a few times at the courthouse to discuss the

case and that counsel's defense investigator submitted reports to counsel describing

the investigator's meetings with Applicant, witness interviews, and a crime scene visit.[38]

### b.  application of AEDPA to claim four

In *Smith II*, the  Colorado Court of Appeals affirmed the state district court's

denial of post-conviction relief on the following grounds:

> We are unable to conclude that counsel's decision to order a
> competency evaluation of defendant was outside the wide range of
> professionally competent assistance. While the choice to have
> defendant evaluated may have harmed their already distressed

---

[35] *Id.*, 12/9/10 Hrg. Tr., at 69-73 .

[36] *Id.*, at 183, 189-91 .

[37] *Id.*

[38] State Court R., 12/9/10 Hrg. Tr., at 158, 167-68.

relationship, counsel testified that he believed defendant was unable to assist in his own defense. Having defendant evaluated was a strategic choice available to, and made by, counsel in this case. *Bergerud*, 223 P.3d at 693 ("'[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas.'") (quoting *Faretta v. California*, 422 U.S. 806, 820 (1975)); *People v. McCormick*, 181 Colo. 162, 167, 508 P.2d 1270, 1273 (1973) ("Mere disagreement as to trial strategy does not equate with ineffective assistance of counsel.").

And although the competency report did not return the finding that defendant could not assist in his own defense, it was made clear that defendant was unable to cooperate in his defense, leading credence to counsel's suspicions. Defendant's subsequent refusal to waive his speedy trial rights was made of his own volition and after discussion with the trial court. Counsel also asked for, and received, a recess in which to discuss the waiver with defendant. While defendant may now regret the decision he made, counsel was not ineffective in allowing defendant to make his election. *See Bergerud*, 223 P.3d at 693-94 ("Decisions such as whether to plead guilty, whether to testify, whether to waive a jury trial, or whether to take an appeal are so fundamental to a defense that they cannot be made by defense counsel, but rather must be made by the defendant himself.").

[# 18-3, at 8-10].

Under Colorado law, the defense may request a competency evaluation if counsel "has reason to believe that the defendant is incompetent to proceed." § 16-8.5-102(2)(b), C.R.S. (2014). A defendant is competent to stand trial when he "does not have a mental disability or developmental disability that prevents [him] from having sufficient present ability to consult with [his] lawyer with a reasonable degree of rational understanding in order to assist in the defense . . . ." §16-8.5-101(4), C.R.S. (2014). Even though counsel's basis for requesting the competency evaluation was thin, I cannot conclude that no "reasonable argument [exists] that counsel satisfied *Strickland's* deferential standard." *See Richter*, 131 S.Ct. at 788.

Furthermore, Applicant has failed to demonstrate that he was prejudiced as a result of undergoing a competency evaluation, or the resulting two-month delay in the state criminal proceeding. Two weeks before trial, Applicant was given the choice of waiving speedy trial to obtain substitute counsel, or proceeding to trial with his appointed counsel. However, contrary to Applicant's assertions that he did not understand the consequences of his decision not to waive speedy trial, the state appellate court found that both the trial court and defense counsel explained those consequences to Applicant. These factual findings are presumed correct, are supported by the state court record,[39] and have not been rebutted by Applicant. Moreover, Applicant's speculation that he might have been acquitted of second degree murder had he waived speedy trial and been represented by a different attorney at trial is insufficient to demonstrate prejudice under *Strickland*. *See Byrd*, 645 F.3d at 1173; *Boone*, 62 F.3d at 327.

I find and conclude that the Colorado Court of Appeals' determination was a reasonable application of *Strickland*. Accordingly, claim four lacks merit and will be dismissed.

### c. application of AEDPA to claim five

In *Smith I*, the Colorado Court of Appeals rejected Applicant's claim that the trial court erred in failing to appoint substitute counsel based on the following reasoning:

> A defendant's fundamental right to counsel is guaranteed by the Sixth Amendment and is essential to a fair trial. U.S. Const. amend. VI; *People v. Arguello*, 772 P.2d 87, 92 (Colo. 1989). "The right to counsel guarantees only competent representation, and does not necessarily include 'a meaningful attorney-client relationship.'" *Arguello*, 772 P.2d at

---

[39] *See* State Court R., 11/10/05 Hrg. Tr.

92 (quoting in part *Morris v. Slappy*, 461 U.S. 1, 14 (1983)); *see also People v. Kelling*, 151 P.3d 650, 653 (Colo. App. 2006) ("an indigent defendant is entitled to effective appointed counsel"); *Hodges*, 134 P.3d at 425 ("the defendant does not have the right to demand a particular attorney"); *People v. Jenkins*, 83 P.3d 1122, 1125 (Colo. App. 2003) ("[a]n indigent defendant is entitled to effective appointed counsel" but not to counsel of his choice).

. . .

We first conclude that the trial court did not abuse its discretion when it found that there had not been a complete breakdown in communication. When defendant was questioned by the court, he admitted that he understood what his counsel told him and could communicate with him. Further, the record supports the court's conclusion that the problem between defendant and his counsel was due to disagreements over strategy. Defendant's counsel stated that defendant raised issues unrelated to his case, wanted to make legal decisions that were within an attorney's province to make, and disagreed with decisions he had made.

The record discloses that a central disagreement between defendant and counsel stemmed from defendant's reluctance to acknowledge that he had a gun and had been drinking, both facts constituting breaches of his probation. Yet defendant was quite willing to argue self-defense and intoxication, which seem to contradict his desire to deny the probation violation. These concerns relate to trial tactics and as "the captain of the ship," counsel's choice of tactics do not rise to the level of a complete breakdown in communication simply because defendant did not agree with or even understand those tactics. *See Steward v. People*, 179 Colo. 31, 34, 498 P.2d 933, 934 (1972) ("Defense counsel stands as captain of the ship in ascertaining what evidence should be offered and what strategy should be employed in the defense of the case."); *People v. Arko*, 159 P.3d 713, 723 (Colo. App. 2006) (cert. granted Apr. 30, 2007) ("As 'captain of the ship,' defense counsel has broad authority regarding the conduct of the litigation, particularly when it comes to tactical and strategic choices.").

Also, in denying defendant's motion, the court properly considered the amount of time remaining before defendant's speedy trial deadline. *See People v. Schultheis*, 638 P.2d 8, 15 (Colo. 1981) (the court may consider the period of time that has elapsed between the date of the alleged offense and trial).

[#18-2, at 9-12].

The state appellate court also rejected Applicant's allegations that there was a conflict of interest between him and his attorney that warranted a substitution of counsel:

> On appeal, defendant now asserts that his attorney had a conflict of interest created by their "extreme animosity." However, defendant must show some record support for his contention that there was an actual conflict of interest and that such conflict adversely affected his representation. The existence of animosity between defendant and his counsel is insufficient in and of itself to constitute a conflict of interest. Further, defendant has failed to show that his trial counsel's performance was affected by animosity. We note that the court stated in a post-trial hearing on defendant's second pro se motion to substitute counsel that it did not observe any deficiency in counsel's performance at trial.

[*Id.* at 14].

Initially, I find and conclude that the state appellate court's resolution of Applicant's claim could not have been contrary to, or an unreasonable application of Supreme Court law.  To date, the Supreme Court has not articulated a standard for deciding a Sixth Amendment claim based on a habeas petitioner's allegation the trial court denied his request for substitute counsel. *See, e.g., Peterson v. Smith*, 510 F. App'x 356, 2013 WL 49565, at *10 (6th Cir. Jan. 3, 2013) (unpublished) (trial court's failure to make sufficient inquiry into a defendant's request for substitute counsel cannot be the basis for relief under AEDPA because such inquiry is not required by clearly established Supreme Court precedent). *Accord Marshall v. Rodgers*, 133 S.Ct. 1446, 1450 (2013) (given that Supreme Court has never addressed how the Constitution applies to a defendant's request for counsel after waiving counsel, state's test could not be said to be "contrary to" Supreme Court case law, regardless of fact that it was contrary to Ninth Circuit's own test).

The Supreme Court has made it clear, however, that the Sixth Amendment does not guarantee "a 'meaningful relationship' between an accused and his counsel." *Morris*, 461 U.S. at 14.  The Supreme Court has also concluded that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159-60 (1988)).  Indeed, the Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar."  *Gonzalez-Lopez*, 548 U.S. at 151 (internal quotation marks omitted).

Based on the above authority, I find that the state appellate court's decision was not contrary to, or an unreasonable application, of Supreme Court law, *see Hatch*, 527 F.3d at 1018.  Therefore, Applicant cannot prevail on claim five unless he demonstrates that the state appellate court's decision was unreasonable in light of the evidence presented in the state court proceeding.

The following legal standards, articulated by the Court of Appeals for the Tenth Circuit, inform my analysis. Substitution of counsel is not warranted unless the defendant shows "good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Padilla*, 819 F.2d 952, 955 (10th Cir.1987) (§ 2255 action) (quoting *McKee v. Harris*, 649 F.2d 927, 931 (2nd Cir.1981)).  A complete breakdown in communication occurs when there is a severe and pervasive conflict between the defendant and his attorney, or evidence of minimal contact with the attorney rendering meaningful communication impossible. *See United States v. Lott*, 310 F.3d 1231, 1249

(10th Cir. 2002).  To warrant substitution counsel, the "breakdown in communication . . .

cannot be the result of a defendant's unjustifiable reaction to the circumstances of his

situation." *Romero v. Furlong,* 215 F.3d 1107, 1114 (10th Cir. 2000).  "A mere

'disagreement about trial strategy does not require substitution of counsel.'" *Lott*, 310

F.3d at 1249 (citing *United States v. Taylor*, 128 F.3d 1105, 1110 (7th Cir.1997)).

The Colorado Court of Appeals' factual findings that there was not a complete

breakdown in communication or an actual conflict of interest between Applicant and

defense counsel (based on their "extreme animosity" for each other) are presumed

correct and are supported by the state court record.[40]  Applicant does not point to any

clear and convincing evidence to contradict the state appellate court's findings that

Applicant was able to communicate with his attorney, despite their differences in opinion

over trial strategy.  "The Sixth Amendment provides no right to counsel blindly following

defendant's instructions." *Padilla*, 819 F.2d at 956 (citing *McQueen v. Blackburn*, 755

F.2d 1174, 1178 (5th Cir.1985)).  Moreover, when Applicant entered his guilty plea to

count 4 of the Information - possession of a weapon by a previous offender – at the

close of the prosecution's case, and following his waiver of the right to testify on his own

behalf, Applicant told the trial court that he was satisfied with his attorney's

representation.[41]  And, although the relationship between Applicant and trial counsel

was antagonistic, there is nothing in the state trial court proceedings to suggest that

---

[40]State Court R., 11/10/05 Hrg. Tr.

[41]*Id.*, 12/1/05 Hrg Tr., at 9-10.

their conflicts resulted in an unjust verdict.[42]  As such, I find that the Colorado Court of

Appeals' determination was reasonable in light of the evidence presented in the state

court proceeding.  The allegations in claim five lack merit and will be dismissed.

## C.  Claim Six

For his sixth claim, Applicant contends that his constitutional rights were violated

when the police failed to collect and preserve a knife found at the crime scene. [# 10,  at

17].

Under *California v. Trombetta*, 467 U.S. 479, 489 (1984), the State may not

destroy evidence with "an exculpatory value that was apparent before it was destroyed"

where the evidence might not be available to the defendant through other means.  The

State's failure to preserve potentially exculpatory evidence violates the Constitution only

if law enforcement authorities acted in bad faith.  *See Arizona v. Youngblood*, 488 U.S.

51, 57-58 (1988).

In *Smith I*, the state appellate court determined the following with respect to the

claim:

> "The Due Process Clause of the Fourteenth Amendment mandates
> that the state disclose to criminal defendants favorable evidence that is
> material to either guilt or punishment." *People v. Braunthal*, 31 P.3d 167,
> 172 (Colo. 2001). When state agents can collect and preserve evidence in
> the performance of their routine procedures, their failure to do so is
> likened to the suppression of evidence. *See People v. Greathouse*, 742
> P.2d 334, 337-38 (Colo. 1987); *see also People v. Casias*, 59 P.3d 853,

---

[42]I note that although Applicant asserts a "conflict of interest" between him and his attorney
because of their acrimonious relationship, Applicant does not allege that his attorney engaged in multiple
or concurrent representation, so as to trigger the presumption of prejudice recognized in *Cuyler v.
Sullivan,* 446 U.S. 335, 350 (1980).  *See Montoya v. Little*, No. 11-1188, 53 F. App'x 496, 498 (10th Cir.
Nov. 20, 2002 (recognizing that Aug. 17, 2011) (unpublished) (stating that *Cuyler's* presumption of
prejudice standard has not been extended by the Supreme Court outside the context of multiple
representation, citing *Mickens v. Taylor*, 535 U.S. 162, 176 (2002)).

856 n.6 (Colo. 2002) ("[i]n certain narrow situations, the failure to collect evidence may be tantamount to the suppression of evidence").

[I]n order to establish a due process violation for failure to preserve potentially exculpatory evidence, the defendant must establish that: (1) the evidence was suppressed or destroyed by the prosecution; (2) the evidence possessed an exculpatory value that was apparent before it was destroyed; and (3) the defendant was unable to obtain comparable evidence by other reasonably available means. *People v. Enriquez*, 763 P.2d 1033, 1036 (Colo. 1988); *see also Braunthal*, 31 P.3d at 173; *Greathouse*, 742 P.2d at 337-38.

Here, defendant has not established two of the test's three prongs. First, the record does not establish that the evidence was suppressed or destroyed by the prosecution. Defendant argued at trial that he shot the victim in self-defense after the victim threatened and cut him with a knife. When the police officers initially collected evidence at the crime scene, defendant explained that he received cuts while working on a car. He also told the officers that the victim had left the premises on foot. At the time, he said nothing to indicate that a knife or the victim's truck was involved in the victim's death. Defendant's own actions led the officers away from discovery of the knife.

The police officers testified at trial that they did not initially collect the knife because there was no indication that a knife was involved in the murder and, therefore, it was not relevant to their investigation. The knife only became relevant to their investigation two days later when defendant confessed and claimed the victim slashed at him with a knife. The officers then returned to the crime scene and obtained the knife from T.H. Based on these circumstances, and because any claim that the knife might have exculpatory value was not made known to the police at the time of their first search and investigation, the record does not support any conclusion that the prosecution suppressed or destroyed the evidence. *See Enriquez*, 763 P.2d at 1036.

Second, the record does not contain evidence that the knife had exculpatory value. The initial test for occult blood was inconclusive. Indeed, a technician testified that she could not determine if the knife had any blood on it.

We acknowledge defendant's argument that the delay in collecting the knife allowed exculpatory evidence to be destroyed because T.H. had an opportunity to wipe off the knife before turning it over to the police. Defendant put the knife back into its sheath and placed it in the victim's truck. T.H. testified that she put the knife in a bag with some clothing and that she did not wash or clean the knife. This does not change our view

that defendant has failed to establish that exculpatory evidence was
destroyed by the investigating officers.

[#18-2, at 19-21].

I find and conclude that the Colorado Court of Appeals' decision was a
reasonable application of *Trombetta* and *Youngblood*.  Again, the state appellate court's
factual findings are presumed correct and are supported by the state court record.[43]
The police did not suppress the knife, but instead recovered it and made it available to
the defense after Defendant informed officers about the knife's potential relevance to
the case.  Police officers had no knowledge that a knife may have been involved in the
shooting at the time they initially collected evidence from the crime scene, before
Applicant made his voluntary statement to the Undersheriff.   At that time, the knife had
only potential exculpatory value.  There is nothing in the state court record to suggest
that law enforcement authorities acted in bad faith in failing to secure the knife from the
outset of the investigation, before T.H. took possession of it while cleaning out the
victim's truck.  *See Youngblood*, 488 U.S. at 57-58.  Although Applicant asserts in his
traverse that the police initially collected the knife from the crime scene and then gave it
to a third person [# 29, at 17], this allegation is refuted by the state court record.
Moreover, once the knife was tested for the presence of blood, the test was
inconclusive.  And, finally, even if T.H. tampered with the knife while it was in her
possession, unbeknownst to law enforcement officers, that conduct is not attributable to
the police.

Accordingly, claim six lacks merit and will be dismissed.

_____

[43] *See* State Court R., 11/28/05 Trial Tr., at 243; 11/29/05 Trial Tr., at 81-83, 139, 217-19;
11/30/05 Trial Tr., at 22-25, 48, 59, 149.

### D. Claim Seven

For his seventh and final claim, Applicant asserts that the trial court violated his constitutional rights by denying newly-appointed sentencing counsel's request for a continuance of the sentencing hearing to allow him to obtain the trial transcripts in order to present evidence in mitigation of punishment. [#10, at 18].

### 1. State court proceedings

After trial, Applicant filed another *pro se* motion to substitute his counsel.[44] The trial court granted the motion, even though the court did not find good cause for the substitution.[45] Applicant's sentencing counsel entered his appearance on February 7, 2006 and the court set the sentencing hearing for March 28, 2006.[46] On February 23, 2006, sentencing counsel filed a motion to continue the sentencing hearing for sixty days because he had not yet reviewed the discovery or obtained the trial transcripts.[47] The trial court did not rule on the motion before the sentencing hearing.

At the March 28, 2006 sentencing, Applicant's counsel asked the court to address his motion for a continuance because he had not received the trial transcripts.[48] Counsel confirmed that he had received the discovery.[49] The sentencing court denied the request for a continuance because counsel was not able to explain why his review

---

[44] State Court R., Court File, at 149.

[45] *Id.* at 160; *see also id.*, 1/25/06 Hrg. Tr.

[46] *Id.*, 2/7/06 Hr. Tr.

[47] *Id.*, Court File, at 165.

[48] *Id.*, 3/28/06 Hrg. Tr., at 3.

[49] *Id.* at 4.

of the trial transcripts was necessary in order to proceed with sentencing.[50]  Counsel

declined to present any evidence at the sentencing hearing because he had not

received the trial transcripts.[51] The sentencing court then verified with defense counsel

that he had received a copy of the pre-sentence report and the supplemental pre-

sentence report before the sentencing hearing.[52]

In *Smith I*,  the Colorado Court of Appeals rejected Applicant's claim on the

following grounds:

> We conclude that the trial court did not abuse its discretion when it
> refused to continue the sentencing hearing. Although defendant had the
> right to present evidence in mitigation of his punishment, see §
> 16-11-102(5), C.R.S. 2007; Crim. P. 32(b), and although the trial
> transcripts may have been helpful to defendant's counsel in preparing for
> the sentencing hearing, he had other sources – namely, the discovery,
> defendant, defendant's trial counsel, and the presentence report –
> available from which to learn of any mitigating factors. We note that
> defendant's counsel did not even talk to defendant nor review the
> discovery he had in his possession prior to the sentencing hearing even
> though he had more than a month and a half to do so. *See Leyba v.*
> *People*, 174 Colo. 1, 5, 481 P.2d 417, 419 (1971) (no abuse of discretion
> in denying a continuance where defendant's counsel had a reasonable
> period of time to prepare for trial).
>
> Further, now that defendant has the transcripts available on appeal,
> he has not pointed to a single mitigating factor which was only available in
> the transcripts and not discernable from the other information which had
> been provided before the hearing. *See Cruthers*, 124 P.3d at 888-89.
>
> Defendant's reliance on *People v. Wright*, 672 P.2d 518 (Colo.
> 1983), is misplaced. In *Wright*, the defendant was precluded from
> presenting mitigating evidence in response to the presentence report
> because he did not receive the report until the day of the hearing. Here,
> defendant received the presentence report in a timely manner and had
> more than a month and a half to prepare for the hearing.

---

[50] *Id.* at 5.

[51] *Id.* at 7.

[52] *Id.* at 8.

[#18-2, at 17-18].

### 2.  application of AEDPA standard of review

The Supreme Court has not addressed the issue of whether the Constitution requires a continuance of the sentencing proceeding in circumstances similar to those presented in Applicant's case.  Rather, the Supreme Court has held that a sentence may not be based on misinformation of "constitutional magnitude." *United States v. Tucker*, 404 U.S. 443, 447 (1972).

I find and conclude that the state appellate court's decision comported with applicable Supreme Court law and was reasonable in light of the evidence presented in the state court proceeding.  Applicant has not pointed to any misinformation relied on by the state sentencing court, much less misinformation of a "constitutional magnitude." *See Tucker*, 404 U.S. at 447.  As such, claim seven lacks merit and will be dismissed.

### IV.  COA & IFP

Under 28 U.S.C. § 2253(c)(2), this Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  Such a showing is made only when a prisoner demonstrates that jurists of reason would find it debatable that a constitutional violation occurred, and that the district court erred in its resolution.  Mr. Smith has not made a substantial showing of the denial of a constitutional right.  Therefore, a certificate of appealability is denied.

Under 28 U.S.C. § 1915(a)(3), the court certifies that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status will be denied for the purpose of appeal.  ***See Coppedge v. United States***, 369 U.S. 438 (1962).  If Mr. Smith files a notice of appeal, he also must pay the full appellate filing fee or file a

motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

## V.  ORDERS

Accordingly, it is ORDERED as follows:

1. That the Amended Application for a Writ of Habeas Corpus 2254 [# 10], filed February 12, 2014, by Applicant, Williard C. Smith, is DENIED;

2. That this case is DISMISSED WITH PREJUDICE;

3. That a certificate of appealability SHALL NOT ISSUE under 28 U.S.C. § 2253(c); and

4.  That leave to proceed *in forma pauperis* on appeal is DENIED without prejudice to the filing of a motion seeking leave to proceed *in forma pauperis* on appeal in the United States Court of Appeals for the Tenth Circuit

Dated May 12, 2015, at Denver, Colorado.

**BY THE COURT:**

Bob Blackburn

Robert E. Blackburn
United States District Judge